REDACTED

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311<br>Honorable Marianne O. Battani |
| In Re: EXHAUST SYSTEMS | 2:16-cv-03702 |
| THIS DOCUMENT RELATES TO: | AMENDED CLASS ACTION COMPLAINT |
| AUTOMOBILE DEALERSHIP ACTION | JURY TRIAL DEMANDED |

Plaintiffs Landers Auto Group No. 1, Inc. d/b/a Landers Toyota ("Plaintiff Landers"); Empire Nissan of Santa Rosa, LLC ("Plaintiff Empire Nissan"); V.I.P. Motor Cars Ltd. ("Plaintiff V.I.P."); Lee Pontiac-Oldsmobile-GMC Truck, Inc. ("Plaintiff Lee"); Panama City Automotive Group, Inc. d/b/a John Lee Nissan ("Plaintiff John Lee"); McGrath Automotive Group, Inc. ("Plaintiff McGrath"); Green Team of Clay Center Inc. ("Plaintiff Green Team"); Lee Auto Malls-Topsham, Inc. d/b/a Lee Toyota of Topsham ("Plaintiff Topsham"); Lee Oldsmobile-Cadillac, Inc. d/b/a Lee Honda ("Plaintiff Lee Honda"); Commonwealth Volkswagen, Inc. d/b/a Commonwealth Volkswagen ("Plaintiff Commonwealth Volkswagen"); Hodges Imported Cars, Inc. d/b/a Hodges Subaru ("Plaintiff Hodges"); Patsy Lou Chevrolet, Inc. ("Plaintiff Patsy Lou"); Superstore Automotive, Inc. ("Plaintiff Superstore"); Cannon Nissan of Jackson, LLC ("Plaintiff Cannon Nissan"); Hammett Motor Company, Inc. ("Plaintiff Hammett"); John O'Neil Johnson Toyota, LLC ("Plaintiff Johnson"); Ancona Enterprise, Inc. d/b/a Frank Ancona Honda ("Plaintiff Ancona"); Landers McLarty Lee's Summit MO, LLC d/b/a Lee's Summit Chrysler Dodge Jeep Ram and d/b/a Lee's Summit Nissan ("Plaintiff Lee's Summit"); Archer-Perdue, Inc. d/b/a/

**REDACTED**

Archer-Perdue Suzuki ("Plaintiff Archer-Perdue"); Table Rock Automotive, Inc. d/b/a Todd Archer Hyundai ("Plaintiff Table Rock"); Bill Pearce Honda ("Plaintiff Pearce"); Reno Dodge Sales, Inc. d/b/a Don Weir's Reno Dodge ("Plaintiff Don Weir"); Pitre, Inc. d/b/a/ Pitre Buick GMC ("Plaintiff Pitre"); Hartley Buick GMC Truck, Inc. ("Plaintiff Hartley"); Westfield Dodge City, Inc. ("Plaintiff Westfield"); John Greene Chrysler Dodge Jeep, LLC ("Plaintiff John Greene"); Herb Hallman Chevrolet, Inc., d/b/a/ Champion Chevrolet ("Plaintiff Champion"); Capitol Chevrolet Cadillac, Inc. ("Plaintiff Capitol Chevrolet"); Capitol Dealerships, Inc. d/b/a Capitol Toyota ("Plaintiff Capitol Toyota"); Landers McLarty Fayetteville TN, LLC ("Plaintiff Fayetteville"); Central Salt Lake Valley GMC Enterprises, LLC d/b/a Salt Lake Valley Buick GMC ("Plaintiff Salt Lake Valley"); Stranger Investments d/b/a Stephen Wade Toyota ("Plaintiff Wade"); Apex Motor Corporation ("Plaintiff Apex"); Shearer Automotive Enterprises III, Inc. ("Plaintiff Shearer"); Ramey Motors, Inc. ("Plaintiff Ramey"); Thornhill Superstore, Inc. d/b/a Thornhill GM Superstore ("Plaintiff Thornhill"); Dave Heather Corporation d/b/a Lakeland Toyota Honda Mazda Subaru ("Plaintiff Lakeland"); Rainbow Chevrolet, Inc. d/b/a Cutter Chevrolet ("Plaintiff Rainbow"); and Stoebner Holdings, Inc. d/b/a Honda Windward ("Plaintiff Windward") (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, consumer protection, and unjust enrichment laws. Plaintiffs demand a jury trial and allege as follows:

REDACTED

## <u>NATURE OF ACTION</u>

1.      This lawsuit is brought as a proposed class action against Tenneco Inc., Tenneco GmbH, Tenneco Automotive Operating Co., Inc. (collectively, "Tenneco"), Bosal Industries-Georgia, Inc. ("Bosal"), Eberspächer Exhaust Technology GmbH & Co. KG, Eberspächer North America Inc. (together, "Eberspächer"), Faurecia SA, Faurecia Abgastechnik GmbH, Faurecia Systèmes d'Échappement, Faurecia Emissions Control Technologies, USA, LLC, and Faurecia Emissions Control Systems, N.A. LLC f/k/a Faurecia Exhaust Systems, Inc. (collectively, "Faurecia"), Meritor, Inc. f/k/a ArvinMeritor, Inc. ("ArvinMeritor"), (all as defined below, and collectively, "Defendants"), and named and unnamed co-conspirators, manufacturers and/or suppliers of Automotive Exhaust Systems ("Exhaust Systems" defined below) globally and in the United States, for engaging in a long-running conspiracy to unlawfully fix, artificially raise, maintain and/or stabilize prices, rig bids for, and allocate the market and customers in the United States for Exhaust Systems.  According to the United States Department of Justice ("DOJ"), Defendants' conspiracy successfully targeted the long-struggling United States automotive industry, raising prices for car manufacturers and automobile dealers alike.

2.      An "Exhaust System" is a system of piping and other parts that conveys noxious exhaust gases away from the passenger compartment and reduces the level of pollutants and engine exhaust noise emitted.  An Exhaust System includes one or more of the following components:  manifold, flex pipes, catalytic converter, oxygen sensor, isolator/gasket/clamps, resonator assemblies/pipe accessories, and muffler/muffler assemblies.[1]  An Exhaust System has

---

[1] Plaintiffs do not allege that Defendants engaged in a conspiracy to fix prices, rig bids, and/or allocate markets for catalytic converters or oxygen sensors as stand-alone products.

**REDACTED**

a "hot end," which is the part of the Exhaust System that is mounted to the engine which is generally comprised of a manifold and catalytic converter, and a "cold end," which is the part of the Exhaust System that is mounted to the underbody of the car which generally contains a muffler, pipes and possibly a catalytic converter.  In some instances, the component parts of an Exhaust System are sourced separately while in other instances they are sourced together.

3.      Plaintiffs seek to represent all automobile dealers that, during the period from and including January 1, 2002 through such time as the anticompetitive effects of Defendants' conduct ceased (the "Class Period"), purchased a new four-wheeled passenger automobile, van, sports utility vehicle, crossover, or pickup truck for resale ("Vehicle") in the United States which included one or more Exhaust Systems as a component part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of Defendants.

4.      Defendants manufacture, market, and/or sell Exhaust Systems throughout and into the United States. Defendants and their co-conspirators (as yet unknown) agreed, combined, and conspired to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for Exhaust Systems.

5.      The DOJ's Antitrust Division is currently conducting a broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry. As part of its criminal investigation, the DOJ is seeking information about unlawful anticompetitive conduct in the market for a number of different, but related automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry.

REDACTED

6.     The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct.  The ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded, to date, nearly $3 billion in criminal fines.

7.     On March 25, 2014, Tenneco publicly disclosed in its 8-K report that it received a subpoena from the DOJ's Antitrust Division related to a global antitrust investigation concerning multiple automotive parts suppliers.  On November 5, 2014, Tenneco publicly disclosed in its 10-Q quarterly report that it reached an agreement with the DOJ's Antitrust Division to grant it conditional leniency in return for Tenneco's self-reporting antitrust violations regarding an unspecified product.

8.     The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several automotive parts manufacturers.

9.     On March 25, 2014, the EC conducted an unannounced raid on Tenneco's Edenkoben, Germany administrative facility.  On the same day, the EC conducted unannounced raids on Eberspächer's and Faurecia's facilities.  Faurecia later confirmed that the investigations relate to suppliers of Exhaust Systems.  Tenneco, Eberspächer and Faurecia each noted in separate statements that their respective companies were cooperating in the EC's investigation.

10.    On November 27, 2014, the Competition Commission of South Africa ("CCSA") announced that it filed a complaint against several of the Defendants and the named co-conspirators for price-fixing, market allocation and big rigging in the market for Exhaust Systems.  The CCSA specifically named, among others, Eberspächer Exhaust GmbH & Co KG, Faurecia Corporation, Tenneco GmbH and Friedrich Boysen GmbH & Co. KG.  The CCSA

**REDACTED**

stated that the conduct began around 2001 and is ongoing.  The CCSA further noted that the Exhaust Systems affected by the cartel were distributed or supplied in South Africa (1) from an Exhaust System supplier located outside of South Africa for assembly in motor Vehicles manufactured and supplied in South Africa and (2) from an OEM located outside of South Africa which assembles Vehicles outside of South Africa and then ships the finished motor Vehicles to South Africa for sale.

11.     The Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and to fix, stabilize, and maintain the prices of Exhaust Systems sold to Vehicle manufacturers and others in the United States. The combination and conspiracy engaged in by Defendants and their co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and state antitrust, unfair competition, consumer protection, and unjust enrichment laws.

12.     As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs and the Classes (as defined below) paid artificially inflated prices for Exhaust Systems during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

13.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection, and unjust enrichment laws, and seek to obtain restitution, recover damages and secure other relief against Defendants for

**REDACTED**

violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

14.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331 and 1337. This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from the Defendants.

15.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found in or transact business in this District.

16.     This Court has *in personam* jurisdiction over Defendants because each, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Exhaust Systems throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United

**REDACTED**

States, including in this District.  Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

17.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, reasonably foreseeable, and intended anticompetitive effects upon interstate commerce within the United States.

18.     The activities of Defendants and their co-conspirators were within the flow of, were intended to have, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

19.     Exhaust Systems manufactured abroad by Defendants and sold for use in Vehicles in the United States are goods brought into the United States for sale, and therefore constitute import commerce. To the extent any Exhaust Systems are purchased in the United States, and such Exhaust Systems do not constitute import commerce, Defendants' activities during the Class Period with respect thereto, as more fully alleged herein, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

20.     By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for Exhaust Systems, which conspiracy unreasonably restrained trade and adversely affected the market for Exhaust Systems.

**REDACTED**

21.    Defendants' conspiracy and wrongdoing described herein adversely affected automobile dealers in the United States that purchased Vehicles in the United States which included one or more Exhaust Systems.

22.    Exhaust Systems manufactured abroad by Defendants and sold for use in Vehicles in the United States are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any Exhaust Systems are purchased in the United States, and such Exhaust Systems do not constitute import commerce, Defendants' activities with respect thereto, as more fully alleged herein during the Class Period, had, and continues to have, a direct, substantial, and reasonably foreseeable effect on United States Commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

## PARTIES

### Plaintiffs

23.    Plaintiff Landers is an Arkansas corporation with its principal place of business in Little Rock, Arkansas. Plaintiff Landers is an authorized Toyota, Scion dealer who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Landers purchased and received the aforementioned Vehicles in Arkansas.

24.    Plaintiff Empire Nissan is a California limited liability company with its principal place of business in Santa Rosa, California. Plaintiff Empire Nissan is an authorized Nissan dealer who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Empire Nissan purchased and received the aforementioned Vehicles in California.

**REDACTED**

25.     Plaintiff V.I.P. is a California company with its principal place of business in Palm Springs, California. Plaintiff VIP is an authorized Mercedes, BMW, Infiniti, and Hyundai dealer who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff V.I.P. purchased and received the aforementioned Vehicles in California.

26.     Plaintiff Lee is a Florida corporation, with its principal place of business in Fort Walton Beach, Florida. Plaintiff Lee is presently an authorized Nissan dealer. During the Class Period, Plaintiff Lee was an authorized Nissan, GMC, Pontiac, Oldsmobile, and Jeep dealer who bought Vehicles containing Exhaust Systems manufactured by Defendants or their co-conspirators.  Plaintiff Lee purchased and received the aforementioned Vehicles in Florida.

27.     Plaintiff John Lee is a Florida corporation with its principal place of business in Panama City, Florida. During the Class Period, Plaintiff John Lee was an authorized Nissan dealer that purchased Vehicles containing Exhaust Systems manufactured by the Defendants or their co-conspirators.  Plaintiff John Lee purchased and received the aforementioned Vehicles in Florida.

28.     Plaintiff McGrath is a Delaware corporation, with its principal place of business in Cedar Rapids, Iowa. Plaintiff McGrath is an authorized Buick, Cadillac, Chevrolet, GMC, Pontiac, Chrysler, Jeep, Dodge, RAM, Kia, Mazda, and Volkswagen dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff McGrath purchased and received the aforementioned Vehicles in Iowa.

29.     Plaintiff Green Team is a Kansas corporation, with its principal place of business in Clay Center, Kansas. Plaintiff Green Team is an authorized Jeep, Dodge, and Ram dealer, who

REDACTED

bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Green Team purchased and received the aforementioned Vehicles in Kansas.

30.     Plaintiff Topsham is a Maine corporation, with its principal place of business in Topsham, Maine. Plaintiff Topsham is an authorized Toyota and Scion dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Topsham purchased and received the aforementioned Vehicles in Maine.

31.     Plaintiff Lee Honda is a Maine corporation, with its principal place of business in Auburn, Maine. Plaintiff Lee Honda is an authorized Honda, Oldsmobile, Cadillac, and GMC dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Lee Honda purchased and received the aforementioned Vehicles in Maine.

32.     Plaintiff Commonwealth Volkswagen is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Volkswagen is an authorized Volkswagen dealer, who bought Volkswagen-brand Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Commonwealth Volkswagen purchased and received the aforementioned Vehicles in Massachusetts.

33.     Plaintiff Hodges is a Michigan corporation with its principal place of business in Ferndale, Michigan. Plaintiff Hodges is an authorized Subaru dealer who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Hodges purchased and received the aforementioned Vehicles in Michigan.

**REDACTED**

34.     Plaintiff Patsy Lou is a Michigan corporation, with its principal place of business in Flint, Michigan. Plaintiff Patsy Lou is an authorized Chevrolet dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Patsy Lou purchased and received the aforementioned Vehicles in Michigan.

35.     Plaintiff Superstore is a Minnesota company, with its principal place of business in White Bear Lake, Minnesota. Plaintiff Superstore is currently an authorized Buick/GMC dealer, doing business under the name White Bear Lake Superstore. During the Class Period, Plaintiff Superstore was an authorized Buick, Pontiac, GMC, and Hyundai dealer who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators. Plaintiff Superstore purchased and received the aforementioned Vehicles in Minnesota.

36.     Plaintiff Cannon Nissan is a Mississippi limited liability company with its principal place of business in Jackson, Mississippi. Plaintiff Cannon Nissan is an authorized Nissan dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Cannon Nissan purchased and received the aforementioned Vehicles in Mississippi.

37.     Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi. Plaintiff Hammett is currently an authorized Ford dealer. During the Class Period, Plaintiff Hammett was an authorized Ford and Mercury dealer who bought Vehicles containing Exhaust Systems manufactured by one or more Defendants and/or their co-conspirators. Plaintiff Hammett purchased and received the aforementioned Vehicles in Mississippi.

**REDACTED**

38.     Plaintiff Johnson is a Mississippi limited liability company, with its principal place of business in Meridian, Mississippi.  Plaintiff Johnson is an authorized Toyota dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period.  Plaintiff Johnson purchased and received the aforementioned Vehicles in Mississippi.

39.     Plaintiff Ancona is a Missouri corporation, with its principal place of business in Oalthe, Kansas.  Plaintiff Ancona was an authorized Honda dealer during the Class Period, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period.  Plaintiff Ancona purchased and received the aforementioned Vehicles in Kansas.

40.     Plaintiff Lee's Summit is a Missouri corporation with its principal place of business in Lee's Summit, Missouri. Plaintiff Lee's Summit is an authorized Chrysler, Dodge, Jeep, RAM, and Nissan dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants or their co-conspirators during the Class Period.   Plaintiff Lee's Summit purchased and received the aforementioned Vehicles in Missouri.

41.     Plaintiff Archer-Perdue is a Nebraska corporation, with its principal place of business in Omaha, Nebraska. Plaintiff Archer-Perdue is an authorized Suzuki dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Archer-Perdue purchased and received the aforementioned Vehicles in Nebraska.

42.     Plaintiff Table Rock is a Nebraska corporation, with its principal place of business in Bellevue, Nebraska. Plaintiff Table Rock is an authorized Hyundai dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-

**REDACTED**

conspirators during the Class Period. Plaintiff Table Rock purchased and received the aforementioned Vehicles in Nebraska.

43.     Plaintiff Pearce is a Nevada corporation, with its principal place of business in Reno, Nevada during the Class Period. Plaintiff Pearce was an authorized Honda dealer during the Class Period, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Pearce purchased and received the aforementioned Vehicles in Nevada.

44.     Plaintiff Don Weir is a Nevada corporation with its principal place of business in Reno, Nevada. Plaintiff Weir is an authorized Chrysler, Dodge and Jeep dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period.  Plaintiff Don Weir purchased and received the aforementioned Vehicles in Nevada.

45.     Plaintiff Pitre is a New Mexico corporation, with its principal place of business in Albuquerque, New Mexico. Plaintiff Pitre is an authorized Buick, Hummer, Pontiac, and GMC dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Pitre purchased and received the aforementioned Vehicles in New Mexico.

46.     Plaintiff Hartley is a New York corporation, with its principal place of business in Jamestown, New York. During the Class Period, Plaintiff Hartley was an authorized Honda, Buick, and GM dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Hartley purchased and received the aforementioned Vehicles in New York.

**REDACTED**

47.     Plaintiff Westfield is a New York company with its principal place of business in Westfield, New York. Plaintiff Westfield is an authorized Dodge dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Westfield purchased and received the aforementioned Vehicles in New York.

48.     Plaintiff John Greene is a North Carolina corporation, with its principal place of business in Morganton, North Carolina.  Plaintiff John Greene was an authorized Chrysler, Dodge, Jeep, RAM, Plymouth, and Oldsmobile dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff John Greene purchased and received the aforementioned Vehicles in North Carolina.

49.     Plaintiff Champion is a Nevada corporation, with its principal place of business in Reno, Nevada.  Plaintiff Champion is an authorized Chevrolet dealer, who bought Vehicles containing Exhaust Systems manufactured by one or more of the Defendants and/or their co-conspirators during the Class Period. Plaintiff Champion purchased and received both the afore-mentioned Vehicles in Nevada.

50.     Plaintiff Capitol Chevrolet is an Oregon corporation, with its principal place of business in Salem, Oregon. Plaintiff Capitol Chevrolet is an authorized Chevrolet, Cadillac, and Subaru dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Capitol Chevrolet purchased and received the aforementioned Vehicles in Oregon.

51.     Plaintiff Capitol Toyota is an Oregon corporation with its principal place of business in Salem, Oregon. Plaintiff Capitol Toyota is an authorized Toyota and Scion dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-

**REDACTED**

conspirators during the Class Period. Plaintiff Capitol Toyota purchased and received the aforementioned Vehicles in Oregon.

52.     Plaintiff Fayetteville is an Arkansas corporation, with its principal place of business in Fayetteville, Tennessee. Plaintiff Fayetteville is an authorized Toyota and Scion dealer who bought Vehicles containing Exhaust Systems manufactured by Defendants or their co-conspirators during the Class Period.  Plaintiff Fayetteville purchased and received the aforementioned Vehicles in Tennessee.

53.     Plaintiff Salt Lake Valley is a Utah company, with its principal place of business in Salt Lake City, Utah. Plaintiff Salt Lake Valley is an authorized Buick and GMC dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Salt Lake Valley purchased and received the aforementioned Vehicles in Utah.

54.     Plaintiff Wade is a Utah corporation, with its principal place of business in St. George, Utah. Plaintiff Wade is an authorized Toyota dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Wade purchased and received the aforementioned Vehicles in Utah.

55.     Plaintiff Apex is a Vermont corporation with its principal place of business in South Burlington, Vermont. Plaintiff Apex is an authorized Acura dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Apex purchased and received the aforementioned Vehicles in Vermont.

56.     Plaintiff Shearer is a Vermont corporation with its principal place of business in Rutland, Vermont. Plaintiff Shearer is an authorized Honda dealer, who bought Vehicles

REDACTED

containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Shearer purchased and received the aforementioned Vehicles in Vermont.

57.     Plaintiff Ramey is a West Virginia company with its principal place of business in Princeton, West Virginia. Plaintiff Ramey was an authorized Scion, Buick, Chevrolet, Pontiac, and Oldsmobile dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Ramey purchased and received the aforementioned Vehicles in West Virginia.

58.     Plaintiff Thornhill is a West Virginia corporation, with its principal place of business in Chapmanville, West Virginia. Plaintiff Thornhill was an authorized Chevrolet, Buick, Pontiac, and GMC dealer, who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Thornhill purchased and received the aforementioned Vehicles in West Virginia.

59.     Plaintiff Lakeland is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin. During the Class Period, Plaintiff Lakeland was an authorized Toyota, Scion, Honda, Mazda, and Subaru dealer who bought Vehicles containing Exhaust Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Lakeland purchased and received the aforementioned Vehicles in Wisconsin.

60.     Plaintiff Rainbow is a Hawaii corporation with its principal place of business in Honolulu, Hawaii.  Plaintiff Rainbow is an authorized Chevrolet dealer who bought Chevrolet-brand Vehicles containing Exhaust Systems manufactured by one or more of the Defendants and/or their co-conspirators, as well as Exhaust Systems manufactured by one or more of the Defendants or their co-conspirators, during the Class Period. Plaintiff Rainbow purchased and received the aforementioned Vehicles in Hawaii.

**REDACTED**

61.     Plaintiff Windward is a Hawaii corporation, with its principal place of business in Kaneohe, Hawaii.  Plaintiff Windward is an authorized Honda dealer who bought Honda-brand Vehicles containing Exhaust Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Exhaust Systems manufactured by one or more of the Defendants or their co-conspirators, during the Class Period. Plaintiff Windward purchased and received the aforementioned Vehicles in Hawaii.

### Defendants

62.     When Plaintiffs refer to a corporate family or companies by a single name in the Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family.  The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of their respective corporate families.  As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

### The Bosal Defendants

63.     Defendant Bosal Industries-Georgia, Inc. is a Georgia corporation with its principal place of business in Ypsilanti, Michigan.  Bosal Industries-Georgia, Inc. operates under the assumed name Bosal International North America and is the North American headquarters of Bosal International N.V.  Defendant Bosal Industries-Georgia, Inc. manufactured, marketed and/or sold Exhaust Systems that were sold and purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Exhaust Systems to Plaintiffs and class members.  At all times during the Class Period, its activities in the

REDACTED

United States were under the control and direction of its Belgian parent, which controlled its policies, sales, and finances.

**The Tenneco Defendants**

64.     Defendant Tenneco Inc. is a Delaware corporation with its headquarters in Lake Forest, Illinois.  Defendant Tenneco Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Exhaust Systems that were sold and purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Exhaust Systems to Plaintiffs and class members.

65.     Defendant Tenneco GmbH is a German company with its office in Edenkoben, Germany.  It is a subsidiary of and wholly owned and/or controlled by its parent, Tenneco Inc.  Defendant Tenneco GmbH manufactured, marketed and/or sold Exhaust Systems that were sold and purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Exhaust Systems to Plaintiffs and class members.  At all times during the Class Period, its activities in the United States were under the control and direction of its U.S. parent, which controlled its policies, sales, and finances.

66.     Defendant Tenneco Automotive Operating Co., Inc. is a Delaware corporation with its headquarters in Lake Forest, Illinois.  It is a subsidiary of and wholly owned and/or controlled by its parent, Tenneco Inc.  Defendant Tenneco Automotive Operating Co., Inc. manufactured, marketed and/or sold Exhaust Systems that were sold and purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Exhaust Systems to Plaintiffs and class members.  At all times during the Class Period, its activities in the United States were under the control and direction of its U.S. parent, which controlled its policies, sales, and finances.

REDACTED

## The Eberspächer Defendants

67.    Defendant Eberspächer Exhaust Technology GmbH & Co. KG is a German company with its principal place of business in Esslingen, Germany.  Defendant Eberspächer Exhaust Technology GmbH & Co. KG – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Exhaust Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

68.    Defendant Eberspächer North America Inc. is a Delaware corporation with its principal place of business in Novi, Michigan.  It is a subsidiary of and wholly owned and/or controlled by Defendant Eberspächer Exhaust Technology GmbH & Co. KG.  Defendant Eberspächer North America Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Exhaust Systems that were sold and purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Exhaust Systems to Plaintiffs and class members. At all times during the Class Period, its activities in the United States were under the control and direction of its German parent, which controlled its policies, sales, and finances.

## The Faurecia Defendants

69.    Defendant Faurecia Abgastechnik GmbH is a German company with its principal place of business in Augsburg, Germany.  It is a subsidiary of and wholly owned and/or controlled by Faurecia SA, which controlled its policies, sales, and finances.  It designs, engineers, and manufactures Exhaust Systems for sale worldwide.  Defendant Faurecia Abgastechnik GmbH – directly and/or through its subsidiaries, which it wholly-owned and/or controlled – manufactured, marketed and/or sold Exhaust Systems that were sold and purchased throughout the United States, including in this District during the Class Period.

REDACTED

70.     Defendant Faurecia Systèmes d'Échappement is a French company with its headquarters in Nanterre, France, where the global headquarters of Faurecia SA is also located. It is a subsidiary of and wholly owned and/or controlled by Faurecia SA, which controlled its policies, sales, and finances.  It designs, engineers and manufactures Exhaust Systems for sale worldwide.   Defendant Faurecia Systèmes d'Échappement – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Exhaust Systems that were sold and purchased throughout the United States, including in this District during the Class Period.

71.     Defendant Faurecia Emissions Control Technologies, USA, LLC ("FECT USA") is a Delaware limited liability company with its principal place of business in Columbus, Indiana.   It is a subsidiary of, and 100% wholly-owned and controlled by, Faurecia USA Holdings, Inc., which is owned and controlled by Faurecia SA.   In May 2007, EMCON Technologies LLC ("EMCON") acquired the Exhaust Systems business of ArvinMeritor, Inc.  In late 2009 or early 2010, Faurecia acquired EMCON.  As reported by Faurecia in its 2009 Annual Report, EMCON was subsequently "incorporated into Faurecia's Exhaust Systems business to form [FECT USA]."  Defendant FECT USA – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Exhaust Systems that were sold and purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Exhaust Systems to Plaintiffs and class members.  At all times during the Class Period, its activities in the United States were under the control and direction of its French parent, which controlled its policies, sales, and finances.

72.     Faurecia Emissions Control Systems N.A., LLC f/k/a Faurecia Exhaust Systems, Inc. ("FECS NA") is a Delaware limited liability company with its principal office in Toledo,

**REDACTED**

Ohio. It is a subsidiary of, and 100% wholly-owned and controlled by, FECT USA. In December, 1999, Faurecia SA acquired AP Automotive Systems, Inc. The acquisition resulted in the creation of two entities: (1) Faurecia Exhaust Systems, LLC; and (2) Faurecia Exhaust Systems, Inc. On June 30, 2014, Faurecia Exhaust Systems, Inc. changed its name to FECS NA. Defendant FECS NA – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Exhaust Systems that were sold and purchased throughout the United States, including in this District during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its French parent, which controlled its policies, sales, and finances.

**The Meritor Defendants**

73. Defendant Meritor, Inc. f/k/a ArvinMeritor, Inc. is an Indiana company with its headquarters in Troy, Michigan. In 2004, EMCON acquired the Exhaust Systems business of ArvinMeritor, Inc. Upon information and belief, ArvinMeritor, Inc. (currently known as Meritor, Inc.) retained some or all of the liabilities of the Exhaust Systems business sold to EMCON. Defendant Meritor, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Exhaust Systems that were sold and purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Exhaust Systems to Plaintiffs and class members.

## AGENTS AND CO-CONSPIRATORS

74. Each Defendant acted as the principal of, or agent for, the other Defendants, and named and unnamed co-conspirators, with respect to the acts, violations, and common course of conduct alleged herein.

**REDACTED**

75.     Co-conspirator Faurecia SA is a French company with its headquarters in Nanterre, France.  Faurecia SA owns and controls Faurecia USA Holdings, Inc., which owns 100% of, and controls, FECT USA (defined above).  Defendant Faurecia SA – directly and/or through its subsidiaries, which it wholly-owned and/or controlled – manufactured, marketed and/or sold Exhaust Systems that were sold and purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Exhaust Systems to Plaintiffs and class members.

76.     Co-conspirator Friedrich Boysen GmbH & Co. KG is a German company with its headquarters in Altensteig, Germany.  Co-conspirator Friedrich Boysen GmbH & Co. KG – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Exhaust Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

77.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants or co-conspirators in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

78.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

**A.     The Exhaust Systems Industry**

**REDACTED**

79.     An "Exhaust System" is a system of piping and other parts that conveys noxious exhaust gases away from the passenger compartment and reduces the level of pollutants and engine exhaust noise emitted.   An Exhaust System includes the following components: manifold, flex pipes, catalytic converter, oxygen sensor, isolator/gasket/clamps, resonator assemblies/pipe accessories, and muffler/muffler assemblies.   An Exhaust System has a "hot end," which is the part of the Exhaust System that is mounted to the engine which is generally comprised of a manifold and catalytic converter, and a "cold end," which is the part of the Exhaust System that is mounted to the underbody of the car which generally contains a muffler, pipes and possibly a catalytic converter.   In some instances, the component parts of an Exhaust System are sourced separately while in other instances they are sourced together.[2]

80.     The exhaust manifold is the first part of the Exhaust System to receive burned exhaust from the engine.   The exhaust manifold funnels the burned exhaust to the exhaust pipes. The exhaust manifold also burns any fuel that was burned inadequately by the engine before funneling it to the exhaust pipes.   The exhaust then passes through the catalytic converter, where any harmful compounds are converted to harmless compounds, and through the resonator and muffler on its way towards the tail pipe, which discharges the burned exhaust away from the Vehicle. The diagram below sets forth a typical Exhaust System.

---

[2] *See* footnote 1, *supra*.

**REDACTED**



81.     Exhaust Systems have three major functions: (i) to channel waste combustion products outside the engine (ii) to reduce noise generated by the engine; and (iii) to clean emissions that can harm the environment.   An Exhaust System is a vital component that is essential for the functioning of a Vehicle engine. Accordingly, the demand for Exhaust Systems is directly linked to the number of Vehicles produced per year.

82.     Exhaust Systems are installed by original equipment manufacturers ("OEMs") in Vehicles as part of the automotive manufacturing process.

83.     For Vehicles, the OEMs – mostly large automotive manufacturers – purchase Exhaust Systems directly from the Defendants.

84.     When purchasing Exhaust Systems, OEMs issue Requests for Quotations ("RFQs") to automotive parts suppliers. These RFQs may be issued on a model-by-model basis for model-specific parts or for a specific engine to be incorporated into multiple models. Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for the lifespan of the model, which is usually four to six years.   Typically, the bidding process for a particular model begins approximately three years prior to the start of production and Exhaust Systems are

**REDACTED**

developed over a year in advance of a Vehicle entering the market.  OEMs procure Exhaust Systems and other parts for U.S.-manufactured Vehicles in the United States and elsewhere.

85.      In a number of instances, Defendants manufacture Exhaust Systems in the U.S. specifically for use in Vehicles sold in the U.S.  In those instances where Defendants manufacture Exhaust Systems abroad, the OEM customer will not infrequently instruct the Defendants to ship Exhaust Systems directly into the U.S. for installation by the OEM in Vehicles sold in the U.S.  OEM customers often request that Defendants include the cost of shipping the Exhaust Systems in Defendants' bids.  Because the cost of shipping Exhaust Systems varies depending upon factors such as the location in which the Vehicle will be manufactured, Defendants often know where Vehicles will be manufactured and sold well in advance of being awarded the business.  For Vehicles manufactured in the U.S., it is frequently the case that those Vehicles are sold in the U.S.

86.      According to the ACPERA Amnesty Applicant, it is not uncommon for the OEM customer to specify to Defendants the country in which the Vehicle(s) will be sold.  In those situations where Exhaust Systems are manufactured abroad and shipped to OEM customers located abroad, OEM customers will, in many instances, inform Defendants of the country in which the Vehicle will be manufactured and sold either in the RFQ documents, during the kick-off meeting[3] or in other communications with Defendants prior to awarding the business.

87.      Accordingly, Defendants' conspiracy targeted the U.S. market for Vehicles and U.S. purchasers through their active participation in a scheme to fix prices, rig bids and allocate

---

[3] Prior to issuing an RFQ, the OEM customer will frequently hold a meeting with potential customers in order to provide them with information regarding the upcoming RFQ.

**REDACTED**

markets for Exhaust Systems, which they knew and intended would be installed in Vehicles sold in the U.S.

88.    Defendants and their co-conspirators supplied Exhaust Systems to OEMs for installation in Vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured and sold Exhaust Systems (a) in the United States for installation in Vehicles manufactured and sold in the United States, (b) in Europe and elsewhere for export to the United States and installation in Vehicles manufactured and sold in the United States, and (c) in Europe and elsewhere for installation in Vehicles manufactured in Europe and elsewhere for export to and sale in the United States.

89.    Plaintiffs and members of the proposed Classes purchased Exhaust Systems indirectly from one or more of the Defendants or their co-conspirators.  By way of example, an automobile dealer may indirectly purchase one or more Exhaust System(s) from Defendants or their co-conspirators as part of purchasing a Vehicle.

90.    According to *MicroMarketMonitor*, the North American Exhaust Systems market is anticipated to grow at a Compound Annual Growth Rate (CAGR) of 9.5 percent from 2014 to 2019, with the United States holding the largest market share. The global demand for Exhaust Systems is propelled by the increasing number of Vehicles across the globe, and the impending stringent fuel efficiency and emission norms.  North America holds the second position in the petrol exhaust market for Exhaust Systems as this region has the majority of gasoline Vehicles. The major contributor to the market in the North American region is the United States, which has the largest production of gasoline engines.

REDACTED

91.    According to *MarketsandMarkets*, the Exhaust Systems market is anticipated to grow at a CAGR of 7.07 percent from 2015 to 2020.  The global market value for Exhaust Systems is projected to reach over USD $28.6 billion by 2020.

**B.    The Structure and Characteristics of the Exhaust Systems Market Render the Conspiracy More Plausible**

92.    The structure and other characteristics of the Exhaust Systems market in the United States are conducive to a price-fixing agreement and have made collusion particularly attractive in this market. Specifically, the Exhaust Systems market: (1) has high barriers to entry; (2) has inelasticity of demand; and (3) is highly concentrated.

**1.    The Exhaust Systems Market Has High Barriers to Entry**

93.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

94.    There are substantial barriers that preclude, reduce, or make more difficult entry into the Exhaust Systems markets.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

95.    Defendants own several patents related to the manufacture of Exhaust Systems. For example, Faurecia Abgastechnik GmbH is the assignee of U.S. Patent No. 20070131889, a patent for a component of an Exhaust System.  These patents place a significant and costly

**REDACTED**

burden on potential new entrants, who must avoid infringing on those patents when entering the market with a new product.

96.     In addition, OEMs cannot change Exhaust Systems suppliers randomly after a supplier is initially selected because the OEMs design the features of their Vehicles so that the Exhaust System they purchase for a Vehicle are then integrated with the other components of the particular Vehicle model.  Thus, Exhaust Systems manufacturers and OEMs must agree on a design that is unique to a particular Vehicle model.  It would be difficult for a new market entrant to do so.

### 2.     There is Inelasticity of Demand for Exhaust Systems

97.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

98.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

99.     Demand for Exhaust Systems is highly inelastic because there are no close substitutes for these products. In addition, customers must purchase Exhaust Systems as an essential part of a Vehicle, even if the prices are kept at a supracompetitive level.

REDACTED

### 3.     <u>The Market for Exhaust Systems Is Highly Concentrated</u>

100.     A highly concentrated market is more susceptible to collusion and other anti-competitive practices.

101.     In 2014, Tenneco reported $2.84 billion in sales in North America for its Clean Air division, which includes sales of Exhaust Systems.

102.     In Tenneco's 2014 Annual Report, Tenneco identifies Faurecia, Eberspächer, Bosal and Boysen as its primary competitors in the Exhaust Systems market.

## C.     <u>Global Government Investigation into Price-Fixing in the Automotive Parts Industry</u>

103.     A globally coordinated antitrust investigation is taking place in the United States, Europe, Canada and Japan, aimed at suppliers of automotive parts in general, and Exhaust Systems in particular. A Japan Fair Trade Commission ("JFTC") official told a leading legal publication that the international automotive parts supplier investigation would continue to widen because the automotive industry as a whole comprises many sub-industries. He characterized the investigation being conducted by international antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

104.     The antitrust probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the European Commission ("EC"). The EC and the FBI have executed surprise raids at the European and U.S. offices of several automotive parts manufacturers, including certain Defendants, as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts.

105.     On February 8, 2010, the EC executed surprise raids at the European offices of certain automotive parts makers as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts. The DOJ has confirmed that its automotive

REDACTED

parts investigation is the largest criminal investigation that the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the illegal conduct.  To date, as a result of its widespread investigation, the DOJ has charged more than 100 individuals and companies with criminal antitrust violations and the DOJ has levied nearly $3 billion in criminal fines against various automotive parts manufacturers.

106.    In February 2010, the JFTC raided the Tokyo offices of DENSO Corporation as part of an expansive investigation into collusion in the automotive parts industry dating back to at least 2000

107.    The JFTC raided offices of several automotive parts manufacturers as part of the spreading investigation into suspected price fixing on automotive parts.  According to its 2011 Annual Report, DENSO Corporation was investigated on July 20, 2011 at various locations, including in Kariya, Aichi and some other sales branches in Japan.  And according to its 2011 Annual Report, Mitsubishi Electric Corporation has been subject to investigations conducted by the JFTC since July 2011.

108.    The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe. "The antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

109.    On February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation.  The FBI executed warrants and searched the offices of these companies.  Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

**REDACTED**

110.    To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant – that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate.   That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

111.    On March 25, 2014, Tenneco publically disclosed in an 8-K report that it received a subpoena from the DOJ's Antitrust Division related to a global antitrust investigation concerning multiple automotive suppliers.   On November 5, 2014, Tenneco publically disclosed in its 10-Q that it reached an agreement with the DOJ's Antitrust Division to grant it conditional leniency in return for Tenneco's self-reporting antitrust violations regarding an unspecified product.

112.    The EC has also conducted dawn raids at the European offices of several of the Defendants because the EC was concerned that companies in the automotive exhaust systems industry may have violated European competition laws.

113.    On March 25, 2014, the EC conducted an unannounced raid on Tenneco's Edenkoben, Germany administrative facility.   On the same day, the EC conducted unannounced raids on Eberspächer's and Faurecia's facilities.   Faurecia later confirmed that the investigations relate to suppliers of Exhaust Systems.   Tenneco, Eberspächer and Faurecia each noted in separate statements that their respective companies were cooperating in the EC's investigation.

REDACTED

114.    On November 27, 2014, the Competition Commission of South Africa ("CCSA")
announced that it filed a complaint against several of the Defendants and the named co-
conspirators for price-fixing, market allocation and big rigging in the market for Exhaust
Systems.  The CCSA specifically named, among others, Eberspächer Exhaust Gmbh & Co KG,
Faurecia Corporation, Tenneco GmbH and Friedrich Boysen GmbH & Co. KG.  The CCSA
stated that the conduct began around 2001 and is ongoing.  The CCSA further noted that the
Exhaust Systems affected by the cartel were distributed or supplied in South Africa (1) from an
Exhaust System supplier located outside of South Africa for assembly in motor Vehicles
manufactured and supplied in South Africa and (2) from an OEM located outside of South Africa
which assembles Vehicles outside of South Africa and then ships the finished motor Vehicle to
South Africa for sale.

**D.      Tenneco Is A Cooperating Defendant**

115.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA")
provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses
its conduct to the DOJ.  In most recent cases in which guilty pleas for price-fixing conduct have
been obtained, there has been a cooperating party that has been accepted into the DOJ's
ACPERA program as an "amnesty applicant." One of the leniency benefits for a conspirator that
is accepted into the ACPERA program is that it is not charged with a criminal offense and is not
required to plead guilty to criminal charges.

116.    Tenneco is the ACPERA "amnesty applicant" in this case.

**E.      Additional Criminal Pleadings in the Automotive Parts Industry**

117.    On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd.
agreed to plead guilty and pay a $200 million criminal fine for its role in a criminal price-fixing

REDACTED

and bid-rigging conspiracy involving the sale of automotive wire harnesses and related products to automobile manufacturers.

118.    In the press release announcing the fine against Furukawa Electric Co. Ltd., Sharis A. Pozen, then the Acting Assistant Attorney General in charge of the DOJ's Antitrust Division, stated that "[a]s a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars. . . ." Ms. Pozen also stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped." The press release also quoted FBI's Special Agent in Charge Andrew G. Arena, who said that "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," and that "[t]he FBI is committed to aggressively pursuing any company involved in antitrust crimes."

119.    On January 30, 2012, the DOJ announced that Yazaki Corporation agreed to plead guilty and pay a $470 million criminal fine and DENSO Corporation agreed to plead guilty and pay a $78 million criminal fine for their respective involvement in multiple price-fixing and bid-rigging conspiracies in the sale of automotive parts to automobile manufacturers in the United States.  According to the three-count criminal Information filed against Yazaki, it engaged in three separate conspiracies: (i) to rig bids for and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to certain automobile manufacturers in the United States and elsewhere; (ii) to rig bids for and to fix, stabilize, and maintain the prices of, instrument panel clusters ("IPCs") sold to certain automobile manufacturers in the United States and elsewhere; and (iii) to fix, stabilize, and maintain the prices of fuel senders sold to an

REDACTED

automobile manufacturer in the United States and elsewhere. According to the two-count felony charge against DENSO Corporation, it engaged in conspiracies to rig bids for, and to fix, stabilize, and maintain the prices of, electronic control units ("ECUs") and heater control panels ("HCPs") sold to an automobile manufacturer in the United States and elsewhere.

120.    In the press release announcing the fines against Yazaki Corporation, its executives, and DENSO Corporation, Special Agent in Charge Andrew G. Arena said that "[t]his criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring for at least a decade. The conduct has also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold[.]"

121.    On April 3, 2012, the DOJ announced that G.S. Electech, Inc. agreed to plead guilty and pay a $2.75 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, speed sensor wire assemblies used on antilock brake systems sold to an automobile manufacturer in the United States and elsewhere.

122.    On April 23, 2012, the DOJ announced that Fujikura Ltd. had agreed to plead guilty and pay a $20 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to an automobile manufacturer in the United States and elsewhere.

123.    On June 6, 2012, the DOJ announced that Autoliv Inc. agreed to plead guilty to a two-count criminal Information and pay a $14.5 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by (i) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts sold to a Japanese automobile manufacturer; and (ii) agreeing to rig bids for, and to fix, stabilize, and

**REDACTED**

maintain the prices of, certain seatbelts, airbags, and/or steering wheels sold to a Japanese automobile manufacturer.

124.    On July 30, 2012, the DOJ announced that TRW Deutschland Holding GmbH agreed to plead guilty and pay a $5.1 million criminal fine for its involvement in a combination and conspiracy, through its employees, including high level employees of its wholly-owned subsidiaries, to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts, airbags and steering wheels sold to two German automobile manufacturers in the United States and elsewhere.

125.    On August 28, 2012, the DOJ announced that Nippon Seiki Co. Ltd. agreed to plead guilty and pay a $1 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, IPCs sold to an automobile manufacturer in in the United States and elsewhere.

126.    On October 30, 2012, the DOJ announced that Tokai Rika Co. Ltd. agreed to plead guilty and pay a $17.7 million criminal fine for its involvement in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, HCPs sold to an automobile manufacturer in the United States and elsewhere. Tokai Rika also agreed to plead guilty to a charge of obstruction of justice related to the investigation of the antitrust violation.

127.    On February 15, 2013, Scott Hammond, then the Deputy Assistant Attorney General in the Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomson Reuters article. He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered. ***I say the biggest with respect to the***

REDACTED

*impact* **on U.S. businesses and** *consumers***, and the number of companies and executives that are subject to the investigation."** (emphasis added).

128.    On July 16, 2013, the DOJ announced that Diamond Electric Mfg. Co. Ltd. agreed to plead guilty and pay a $19 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, ignition coils sold to automobile manufacturers in the United States and elsewhere.

129.    In the press release announcing the fine against Diamond Electric Mfg. Co. Ltd., Robert D. Foley III, Agent in Charge, FBI Detroit Division said "[t]hose who engage in price fixing, bid rigging and other fraudulent schemes harm the automotive industry by driving up costs for vehicle makers and buyers."

130.    On July 18, 2013, Panasonic Corporation agreed to plead guilty and to pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of various automotive parts including high intensity discharge ("HID") ballasts, switches and steering angle sensors installed in automobiles sold in the United States and elsewhere.

131.    On September 26, 2013, nine additional Japanese automotive suppliers agreed to plead guilty to conspiracy charges and pay more than $740 million in criminal fines for their roles in rigging the prices of more than 30 different products:

> a.    Hitachi Automotive Systems Ltd. agreed to plead guilty and pay a $195 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of automotive parts, including, among others, air flow meters, fuel injection systems, electronic throttle bodies, and inverters sold to automobile manufacturers in the United States and elsewhere;

**REDACTED**

b.      Mitsuba Corporation agreed to plead guilty and pay a $135 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere. Mitsuba Corporation's plea agreement, defined "automotive parts" to include windshield wiper systems, windshield washer systems, starter motors, power window motors, fan motors, radiator fans, door mirrors, lamps, power seat motors, sunroof, door and tailgate motors, electric power steering motors, electronic throttle motors, horns, automotive electric relays and switches, automotive electric actuators, AC generators, and fuel pumps. Mitsuba also agreed to plead guilty to one count of obstruction of justice because of the company's efforts to destroy evidence ordered by a high-level U.S.-based executive after learning of the U.S. investigation of collusion in the automotive parts industry;

c.      Mitsubishi Electric Corporation agreed to plead guilty and pay a $190 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere. For purposes of Mitsubishi Electric Corporation's plea agreement, "automotive parts" were defined to include AC generators, air bag sensors, electronic control units, exhaust gas recirculation valves, fuel injectors, fuel pumps, HID ballasts, ignition coils, integrated units, keyless entry systems, MAP sensors, purge control valves, starter motors, throttle bodies, variable cam timing, and variable valve timing;

**REDACTED**

   d. Mitsubishi Heavy Industries Ltd. agreed to plead guilty and pay a $14.5 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of compressors and condensers sold to automobile manufacturers in the United States and elsewhere;

   e. T.RAD Co. Ltd. agreed to plead guilty and pay a $13.75 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of radiators and automatic transmission fluid warmers ("ATF warmers") sold to automobile manufacturers in the United States and elsewhere;

   f. Valeo Japan Co. Ltd. agreed to plead guilty and pay a $13.6 million criminal fine for its participation in a conspiracy to allocate the supply of, rig bids for, and to fix, stabilize and maintain the prices of air conditioning systems sold to automobile manufacturers in the United States and elsewhere;

   g. JTEKT Corporation agreed to plead guilty and pay a $103.27 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings and electric powered steering assemblies sold to automobile manufacturers in the United States and elsewhere;

   h. NSK Ltd. agreed to plead guilty and pay a $68.2 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize, and maintain the prices of bearings sold to an automobile manufacturer in the United States and elsewhere; and

   i. Yamashita Rubber Co. Ltd. agreed to plead guilty and to pay an $11 million criminal fine for its participation in a conspiracy to rig bids for, and to fix,

**REDACTED**

raise and maintain the prices of automotive anti-vibration rubber products sold in the United States and elsewhere to automobile manufacturers.

132.    On the same day, September 26, 2013, then United States Attorney General Eric Holder presented the DOJ's most recent findings in the ongoing automotive parts investigation. Then Attorney General Holder also described how the conspiracies worked: "[c]ompany executives met face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies. In order to keep their illegal conduct secret, they used code names and met in remote locations. Then they followed up with each other regularly to make sure the collusive agreements were being adhered to."

133.    The diagram below, which was prepared by the DOJ, illustrates the September 26, 2013 guilty pleas and the corresponding automotive parts to which the various manufacturers have admitted price-fixing.



**REDACTED**

134.    On October 9, 2013, Takata Corporation announced that it agreed to pay $71.3 million to settle antitrust charges brought by the United States federal prosecutors for its role in a conspiracy to price-fix seatbelts.

135.    On November 26, 2013, the DOJ announced that Toyo Tire & Rubber Co. Ltd. agreed to plead guilty and pay a $120 million criminal fine for its role in two separate conspiracies. Toyo Tire & Rubber Co. Ltd. engaged in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, raise, and maintain the prices of automotive anti-vibration rubber products and driveshaft parts sold to automobile manufacturers in the United States and elsewhere, and by agreeing to allocate sales of, and to fix, raise, and maintain the prices of, automotive constant-velocity-joint boot products sold to GKN plc and its subsidiaries in the United States and elsewhere.

136.    On November 27, 2013, the DOJ announced that Stanley Electric Co. Ltd. agreed to plead guilty and pay a $1.44 million criminal fine for its participation in a conspiracy to fix prices of automotive HID lamp ballasts installed in automobiles sold in the United States and elsewhere.

137.    On January 16, 2014, the DOJ announced that Koito Manufacturing Co. Ltd. agreed to plead guilty and pay a $56.6 million criminal fine for its roles in separate price-fixing conspiracies involving automobile lighting fixtures and automotive HID lamp ballasts installed in cars sold in the United States and elsewhere.

138.    On February 3, 2014, the DOJ announced that Aisan Industry Co. Ltd. agreed to plead guilty and pay a $6.86 million criminal fine for its role in a price-fixing conspiracy involving electronic throttle bodies sold to an automobile manufacturer in the United States and elsewhere.

REDACTED

139.     On February 13, 2014, the DOJ announced that Bridgestone Corp. agreed to plead guilty and pay a $425 million criminal fine for its role in a conspiracy to fix prices of automotive anti-vibration rubber parts installed in automobiles sold in the United States and elsewhere.

140.     On April 23, 2014, the DOJ announced that Showa Corp. agreed to plead guilty and pay a $19.9 million criminal fine for its role in a conspiracy to fix prices and rig bids for pinion-assist type electric powered steering assemblies installed in cars sold in the United States and elsewhere.

141.     On August 19, 2014, the DOJ announced that NGK Sparkplug Co. Ltd. agreed to plead guilty and pay a $52.1 million criminal fine for its role in a conspiracy to fix prices of, and rig bids for spark plugs, standard oxygen sensors, and air fuel ratio sensors installed in cars sold to automobile manufacturers in the United States and elsewhere.

142.     On September 29, 2014, the DOJ announced that Toyoda Gosei Co. Ltd. agreed to plead guilty and pay a $26 million criminal fine for its role in the combination and conspiracy to suppress competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive hoses sold to an automobile manufacturer in the United States, as well as agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of, automotive airbags and steering wheels sold to automobile manufacturers in the United States and elsewhere.

143.     On October 31, 2014, the DOJ announced that Hitachi Metals Ltd. agreed to plead guilty and pay a $1.25 million criminal fine for its role in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, rig bids for, and to fix, raise, and maintain the prices of automotive brake hoses installed in automobiles sold to an automobile manufacturer in the United States and elsewhere.

**REDACTED**

144.    On November 13, 2014, the DOJ announced that Aisin Seiki Co. Ltd. agreed to plead guilty and pay a $35.8 million criminal fine for its role in a conspiracy to allocate customers of variable valve timing devices installed in cars sold to automobile manufacturers in the United States and elsewhere.

145.    On November 24, 2014, the DOJ announced that Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. agreed to plead guilty and pay a criminal fine of $4 million for their roles in a conspiracy to rig bids of IPCs installed in Vehicles manufactured and sold in the United States.

146.    On January 27, 2015, the DOJ announced that Sanden Corp. agreed to plead guilty and pay a $3.2 million criminal fine for its participation in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to fix, stabilize, and maintain the prices of compressors sold to an automobile manufacturer in the United States and elsewhere.

147.    On March 31, 2015, the DOJ announced that Robert Bosch GmbH agreed to plead guilty and pay a $57.8 million criminal fine for its role in a conspiracy to fix prices and rig bids for spark plugs, oxygen sensors and starter motors sold to automobile and internal combustion engine manufacturers in the United States and elsewhere.

148.    On April 28, 2015, the DOJ announced that Yamada Manufacturing Co., Ltd. agreed to plead guilty and pay a $2.5 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of steering columns sold to an automobile manufacturer in the United States and elsewhere, from at least as early as the Fall of 2007 and continuing until as late as September 2012, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

REDACTED

149.    On September 3, 2015, the DOJ announced that NGK Insulators Ltd. agreed to plead guilty and pay a $65.3 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of ceramic substrates for automotive catalytic converters supplied to automobile manufacturers in the United States and elsewhere.  The company also agreed to plead guilty to obstruction of justice for altering, destroying or concealing documents with the intent to impede the criminal antitrust investigation.

150.    On September 16, 2015, the DOJ announced that Kayaba Industries Co., Ltd. d/b/a KYB Corporation agreed to plead guilty and pay a $62 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate markets, rig bids for, and to fix, stabilize, and maintain the prices of shock absorbers sold to certain automobile and motorcycle manufacturers in the United States and elsewhere.

151.    On October 8, 2015, the DOJ announced that two former executives and one current executive of Nishikawa Rubber Co. were indicted for conspiring to fix the prices of automotive body sealing products, which include body-side opening seals, door-side weather-stripping, glass-run channels, trunk lids and other smaller seals.  Two of the individuals were also indicted for instructing and encouraging certain employees of Nishikawa Rubber Co. to destroy documents in an effort to impede the criminal antitrust investigation.

152.    On November 19, 2015, the DOJ announced that INOAC Corp. agreed to plead guilty and pay a $2.35 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of certain plastic interior trim automotive parts sold to an automobile manufacturer in the United States and elsewhere.

REDACTED

153.    On March 17, 2016, the DOJ announced that Omron Automotive Electronics Co., Ltd. agreed to plead guilty and pay a $4.55 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of power window switches sold to an automobile manufacturer in the United States and elsewhere.

154.    On May 16, 2016, the DOJ announced that Corning International Kabushiki Kaisha agreed to plead guilty and pay a $66.5 million criminal fine for it role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of ceramic substrates sold in the United States and elsewhere, and used in catalytic converters supplied to automobile manufacturers in the United States and elsewhere.

155.    On June 15, 2016, the DOJ announced that a federal grand jury, sitting in the U.S. District Court for the Southern District of Ohio, returned two indictments charging Japanese automotive parts companies, their U.S. subsidiaries, and a total of five executives with criminal antitrust violations for their participation in international conspiracies to eliminate competition in the sale of automotive parts in the United States.  One of the indictments charges Tokai Kogyo Co. Ltd., its wholly-owned U.S. subsidiary, Green Tokai Co. Ltd., and its former executive Akitada Tazumi with conspiring to rig bids for and fix the prices of automotive body sealing products sold to an automobile manufacturer for installation in vehicles sold in the United States and elsewhere.

156.    The other June 15, 2016 indictment charges Maruyasu Industries Co. Ltd., its wholly-owned U.S. subsidiary, Curtis-Maruyasu America Inc., and their executives, Tadao Hirade, Satoru Murai, Kazunori Kobayashi and Yoshihiro Shigematsu, with conspiring to fix

**REDACTED**

prices, allocate customers, and rig bids for Automotive Steel Tubes sold to automobile manufacturers for installation in vehicles sold in the United States and elsewhere.

157.   On July 20, 2016, the DOJ announced that Nishikawa Rubber Co. Ltd. agreed to plead guilty and pay a $130 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of automotive body sealing products sold to automobile manufacturers in the United States and elsewhere.

158.   On August 9, 2016, the DOJ announced that Hitachi Automotive Systems Ltd. agreed to plead guilty and pay an additional criminal fine of $55.48 million for its participation in a conspiracy to allocate markets, fix prices and rig bids for shock absorbers sold to vehicle manufacturers in the United States and elsewhere from the mid-1990s until Summer 2011. According to the DOJ press release, although Hitachi Automotive Systems Ltd. previously agreed to plead guilty to price-fixing and bid-rigging various other automotive parts, it failed to uncover and disclose that it had also conspired to fix the prices of shock absorbers.

159.   On September 15, 2016, the DOJ announced that Alpha Corporation agreed to plead guilty to a one count criminal Information and pay a $9 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of automotive access mechanisms sold to automobile manufacturers in the United States and elsewhere.

160.   On November 8, 2016, the DOJ announced that Usui Kokusai Sangyo Kaisha Ltd. agreed to plead guilty to a one count criminal Information and pay a $7.2 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry

**REDACTED**

by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of automotive steel tubes sold to automobile manufacturers in the United States and elsewhere.

161.    On March 7, 2017, the DOJ announced that Kiekert AG agreed to plead guilty and to pay a $6.1 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of side-door latches and latch minimodules sold to automobile manufacturers in the United States and elsewhere.

162.    To date, 48 companies and 65 executives have been charged in the Antitrust Division's ongoing investigation into price-fixing and bid-rigging in the automotive parts industry.  Of the 48 companies charged, 44 have either pleaded guilty or agreed to plead guilty and, altogether, they have agreed to pay nearly $3 billion in criminal fines.

163.    "This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade.  The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold," said FBI Special Agent in Charge Andrew G. Arena.  "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system.  The FBI is committed to aggressively pursuing any company involved in antitrust crimes," Arena also said.

**F.    Illustrative Examples**

164.    Illustrative examples of Defendants' conspiratorial conduct in the market for Exhaust Systems include, but are not limited to, the following:

**REDACTED**



**REDACTED**



**REDACTED**



REDACTED



## CLASS ACTION ALLEGATIONS

172.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All automobile dealers that, during the Class Period, purchased a Vehicle for resale in the United States that included one or more Exhaust System(s) as a component part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant, or indirectly purchased one or more Exhaust Systems, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

173.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and antitrust, unfair competition, and consumer protection laws of the states whose laws are set forth in the Second and Third Claims below, as well as the unjust enrichment laws of Missouri, Massachusetts, and Illinois.  The states whose laws are set forth in the Second and Third Claims below, as well as Missouri, Massachusetts, and Illinois, are collectively referred to as the "Indirect Purchaser States."  These claims are brought by Plaintiffs

**REDACTED**

on behalf of themselves and entities in the Indirect Purchaser States listed in the Second, Third, and Fourth Claims as follows on behalf of the following class (the "Damages Class"):

> All automobile dealers, in the Indirect Purchaser States, that, during the Class Period, purchased a Vehicle for resale in the United States that included one or more Exhaust System(s) as a component part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant, or indirectly purchased one or more Exhaust Systems, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

174.    The Nationwide Class and the Damages Class are referred to herein as the "Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons or entities who purchased Exhaust Systems directly, and persons or entities in the End-Payor Class, as defined in the End-Payor complaint.

175.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) hundreds of members in each Class.

176.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

> (a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Exhaust Systems sold in the United States;

> (b)    The identity of the participants of the alleged conspiracy;

**REDACTED**

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated the Sherman Antitrust Act, as alleged in the First Claim for Relief;

(e)     Whether the alleged conspiracy violated state antitrust, unfair competition, and/or consumer protection laws, as alleged in the Second and Third Claims for Relief;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injuries to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of Exhaust Systems sold in the United States during the Class Period;

(i)     Whether automobile dealers purchasing Exhaust Systems and Vehicles containing Exhaust Systems have been deprived of free and open competition;

(j)     Whether Plaintiffs and members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

(k)     Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

**REDACTED**

      (l)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

      (m)    The appropriate class-wide measure of damages for the Damages Class.

177.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Exhaust Systems purchased indirectly from Defendants and/or their co-conspirators.

178.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

179.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

180.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

REDACTED

181.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

### PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

182.    Defendants' price-fixing conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated for Exhaust Systems;

(b)    The prices of Exhaust Systems have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)    Indirect purchasers of Exhaust Systems have been deprived of free and open competition; and

(d)    Indirect purchasers of Exhaust Systems paid artificially inflated prices for Exhaust Systems.

183.    During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for Exhaust Systems as a result of Defendants' conspiracy. Automobile dealers ultimately bore the inflated prices. Those overcharges have unjustly enriched Defendants.

184.    The markets for Exhaust Systems and Vehicles are inextricably linked and intertwined because the market for Exhaust Systems exists to serve the Vehicle market.  Without the Vehicles, the Exhaust Systems have little to no value because they have no independent utility. Indeed, the demand for Vehicles creates the demand for Exhaust Systems. As stated in the 2010 Annual Report of Lear Corp., an automotive parts supplier: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer and fleet demand for automotive vehicles."

185.    Exhaust Systems are identifiable, discrete physical products that remain essentially unchanged when incorporated into a Vehicle. As a result, Exhaust Systems follow a

**REDACTED**

traceable physical chain of distribution from Defendants to Plaintiffs and the members of the Classes, and cost changes attributable to Exhaust Systems can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

186.    Just as Exhaust Systems can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Exhaust Systems affect prices paid by indirect purchasers of Vehicles containing Exhaust Systems.

187.    Hence, the inflated prices of Exhaust Systems in Vehicles resulting from the Defendants' and their co-conspirators' bid-rigging and price-fixing conspiracy have ultimately been borne by Plaintiffs and other class members.

188.    The purpose of the conspiratorial conduct of Defendants and their co-conspirators was to raise, fix, rig or stabilize the price of Exhaust Systems and, as a direct and foreseeable result, the price of Vehicles containing Exhaust Systems.  Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs.  Thus, it is possible to isolate and identify only the impact of an increase in the price of Exhaust Systems on prices for Vehicles even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of Exhaust Systems affects changes in the price of Vehicles. In such models, the price of Exhaust Systems would be treated as an independent or explanatory variable. The model can isolate how changes in the price of Exhaust Systems impact the price of

REDACTED

Vehicles containing Exhaust Systems while controlling for the impact of other price-determining factors.

189.    The precise amount of the overcharge impacting the prices of Vehicles containing Exhaust Systems can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge automobile dealers bore. Thus, the economic harm to Plaintiffs and members of the Classes can be quantified.

190.    On September 26, 2013, then United States Attorney General Eric Holder in the Antitrust Division presented the DOJ's then most recent findings in the ongoing automotive parts investigation. He stated "[t]hese international price fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers. In total, more than 25 million cars purchased by American consumers were affected by the illegal conduct." Then Attorney General Holder also described how the conspiracies worked: "[c]ompany executives met face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of automotive parts sold to U.S. car companies. In order to keep their illegal conduct secret, they used code names and met in remote locations. They followed up with each other regularly to make sure the collusive agreements were being adhered to."  Then Attorney General Holder explained that the automotive parts conspiracies "targeted U.S. manufacturing, U.S. businesses, and U.S. consumers."

191.    By reason of the violations of the antitrust and consumer protection laws alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Exhaust Systems than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have

REDACTED

suffered damages in an amount presently undetermined.  This is an antitrust injury of the type

that the antitrust laws were meant to punish and prevent.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

**A.      The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not And Could Not Discover Their Claims**

192.      Plaintiffs repeat and re-allege the allegations set forth above.

193.      Plaintiffs and the members of the Classes had no knowledge of the combination

or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims

set forth herein, until (at the earliest) March 25, 2014, the date that Tenneco publically disclosed

in an 8-K report that it received a subpoena from the DOJ's Antitrust Division related to a global

antitrust investigation concerning multiple automotive suppliers.[5]

194.      Plaintiffs and members of the Classes are automobile dealers who purchased

Vehicles. They had no direct contact or interaction with Defendants in this case and had no

means from which they could have discovered the Exhaust Systems combination and conspiracy

described in this Complaint before March 25, 2014, the date that Tenneco publically disclosed in

an 8-K report that it received a subpoena from the DOJ's Antitrust Division related to a global

antitrust investigation concerning multiple automotive suppliers.

---

[5]  Plaintiffs and members of the Classes had no knowledge of Defendants Bosal, Eberspächer, and Faurecia's participation in the combination or conspiracy alleged herein until, May 19, 2015, the date that Plaintiffs were provided with confidential information regarding these Defendants' participation in the combination or conspiracy alleged herein. No information in the public domain was available to the Plaintiffs and the members of the Classes prior to May 19, 2015 that revealed sufficient information to suggest that the aforementioned Defendants were involved in the combination or conspiracy alleged herein. Therefore, the statute of limitations did not begin to run because Plaintiffs and members of the Classes did not and could not discover their claims, or in the alternative, because fraudulent concealment tolled the statute of limitations, until May 19, 2015 with respect to Bosal, Eberspächer and Faurecia.

**REDACTED**

195.   No information in the public domain was available to Plaintiffs and members of the Classes concerning the combination or conspiracy alleged herein prior to March 25, 2014, the date that Tenneco publically disclosed in an 8-K report to the SEC that it received a subpoena from the DOJ's Antitrust Division related to a global antitrust investigation concerning multiple automotive suppliers, that revealed sufficient information to suggest that any of the Defendants were involved in a criminal conspiracy to fix the prices of, and rig bids for Exhaust Systems. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of the Defendants' dealings with OEMs or other direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

196.   For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

**B.    Fraudulent Concealment Tolled the Statute of Limitations**

197.   In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes.  Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until March 25, 2014, the date that Tenneco publically disclosed in an 8-K report to the SEC that it received a subpoena

**REDACTED**

from the DOJ's Antitrust Division related to a global antitrust investigation concerning multiple automotive suppliers.[6]

198.    Before that time, Plaintiffs and the members of the Classes were unaware of Defendants' unlawful conduct, and did not know before then that they were paying supracompetitive prices for Exhaust Systems throughout the United States during the Class Period.  No information, actual or constructive, was ever made available to Plaintiffs and the members of the Classes that even hinted to Plaintiffs that they were being injured by the Defendants' unlawful conduct.

199.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

200.    Specifically, as then Attorney General Holder explained in connection with the DOJ's globally coordinated investigation into price-fixing in the Automotive parts industry, "[i]n order to keep their illegal conduct secret, [Defendants] used code names and met in remote locations."

201.    By its very nature, Defendants' and their co-conspirators' anticompetitive conspiracy and unlawful combination was inherently self-concealing.  Exhaust Systems are not exempt from antitrust regulation and, thus, Plaintiffs and members of the Classes reasonably considered the Exhaust Systems industry to be a competitive industry.  Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business.  Accordingly, a reasonable person under the circumstances would not have

---

[6] *See* footnote 4.

**REDACTED**

been alerted to begin to investigate the legitimacy of the Defendants' Exhaust Systems prices before March 25, 2014, the date that Tenneco publically disclosed in an 8-K report that it received a subpoena from the DOJ's Antitrust Division related to a global antitrust investigation concerning multiple automotive suppliers.

202.   Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

2.   Throughout the course of the conspiracy, Defendants met and communicated in secret to conceal their conspiracy from the public and avoid detection thereof.  Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names and meeting at private residences or remote locations.  The conspirators also coordinated their pricing in a manner to avoid detection by the OEMs.  The exact dates and times of these meetings are within the knowledge of the Defendants and the named co-conspirators.

203.   Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until May 19, 2015, the date that Plaintiffs were provided confidential information regarding Defendants' participation in the combination or conspiracy alleged herein.

REDACTED

204.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run until March 25, 2014.

**FIRST CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Antitrust Act**
**(on behalf of Plaintiffs and the Nationwide Class)**

205.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

206.    Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1).

207.    The acts done by each of the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

208.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Exhaust Systems, thereby creating anticompetitive effects.

209.    The anticompetitive acts were intentionally directed at the United States market for Exhaust Systems and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for these products throughout the United States.

210.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Exhaust Systems.

211.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated automobile dealer purchasers in the Nationwide Class who purchased Exhaust Systems have been harmed by being forced to pay inflated, supracompetitive prices for Exhaust Systems.

**REDACTED**

212.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

213.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for Exhaust Systems has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for Exhaust Systems sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class who purchased Exhaust Systems indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

214.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Exhaust Systems purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

215.    Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' price-fixing, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced Exhaust Systems and Vehicles containing Exhaust Systems.

REDACTED

216.     Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Exhaust Systems and Vehicles containing Exhaust Systems because they are required to purchase Vehicles and Exhaust Systems to continue to operate their businesses.

217.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

218.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

<u>SECOND CLAIM FOR RELIEF</u>
<u>Violation of State Antitrust Statutes</u>
<u>(on behalf of Plaintiffs and the Damages Class)</u>

219.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

220.     During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Exhaust Systems in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

221.     The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive levels the prices for Exhaust Systems, to rig bids for the sale of Exhaust Systems, and to allocate customers for Exhaust Systems in the United States.

222.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

> (a)     participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Exhaust Systems at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize

**REDACTED**

effective prices paid by Plaintiffs and members of the Damages Class with respect to Exhaust Systems sold in the United States;

(b)     allocating customers and markets for Exhaust Systems in the United States in furtherance of their agreements; and

(c)     participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

223.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate customers with respect to Exhaust Systems.

224.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

225.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems.

**REDACTED**

(b)    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

226.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq*.

(a)    During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Exhaust Systems at supracompetitive levels.

(b)    The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Exhaust Systems.

**REDACTED**

(c)     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of Exhaust Systems; and (2) Allocating among themselves the production of Exhaust Systems.

(d)     The combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California: (1) Price competition in the sale of Exhaust Systems has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Exhaust Systems sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Exhaust Systems or Vehicles containing Exhaust Systems manufactured by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Exhaust Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

**REDACTED**

227.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Exhaust Systems or Vehicles in the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Exhaust Systems in the District of Columbia, paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems, including in the District of Columbia.

(b)    During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq*.

REDACTED

228.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

(a)    Defendants' unlawful conduct had the following effects: (1) Exhaust Systems' price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Exhaust Systems' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and vehicles containing Exhaust Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*  Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

229.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Exhaust System prices were raised, fixed, maintained and

**REDACTED**

stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq*.

230.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive,

**REDACTED**

artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq*.

231.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout Maine; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

**REDACTED**

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.

232.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

**REDACTED**

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

233.     Defendants have entered into an unlawful agreement in unreasonable restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems

(b)     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

REDACTED

234.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Exhaust Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Exhaust Systems or Vehicles in Mississippi, were deprived of free and open competition, including in Mississippi; and (4) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Exhaust Systems or Vehicles in Mississippi paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems, including in Mississippi.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

**REDACTED**

235. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

236. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated

**REDACTED**

throughout Nevada; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Exhaust Systems or Vehicles in Nevada, were deprived of free and open competition, including in Nevada; and (4) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Exhaust Systems or Vehicles in Nevada, paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems, including in Nevada.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq*.

237.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire;

**REDACTED**

(3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems.

(b)        During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)        As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)        By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

238.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

(a)        Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems.

**REDACTED**

(b)      During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

239.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout New York; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Exhaust Systems or Vehicles in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York, paid supracompetitive, artificially inflated prices for Exhaust Systems when they purchased, including in New York, Exhaust Systems or Vehicles containing Exhaust Systems, or purchased, including in New York, Exhaust Systems or Vehicles containing Exhaust Systems that were otherwise of lower quality than they would have been

2:16-cv-03702-MOB-MKM   Doc # 79   Filed 06/29/17   Pg 79 of 106   Pg ID 3352

**REDACTED**

absent Defendants' and their co-conspirators' illegal acts, or were unable to purchase Exhaust Systems or Vehicles containing Exhaust Systems that they would have otherwise purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

240.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Exhaust Systems or Vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in

**REDACTED**

North Carolina and/or purchased Exhaust Systems or Vehicles in North Carolina, paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles, including in North Carolina.

(b)      During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq*.

241.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems.

**REDACTED**

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

242.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

81

**REDACTED**

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

243.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Exhaust Systems or Vehicles in South Dakota, were deprived of free and open competition, including in South Dakota; and (4) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Vehicles or Exhaust Systems in South Dakota, paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems, including in South Dakota.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

**REDACTED**

      (c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      (d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

244.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq*.

      (a)     Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Exhaust Systems or Vehicles in Tennessee, were deprived of free and open competition, including in Tennessee; and (4) Plaintiffs and members of the Damages Class, including those who resided in Tennessee, and/or purchased Exhaust Systems or Vehicles in Tennessee, paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems, including in Tennessee.

      (b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

**REDACTED**

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

245.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-3101, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout Utah; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq*.

**REDACTED**

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq.*

246.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Plaintiffs are entitled to relief pursuant to Vermont Stat. Ann. 9 § 2465 and any other applicable authority.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

**REDACTED**

247.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Exhaust Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia, and/or purchased Exhaust Systems or Vehicles in West Virginia, were deprived of free and open competition, including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Vehicles or Exhaust Systems in West Virginia paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems, including in West Virginia.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

**REDACTED**

248.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

(a)   Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Exhaust System prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems.

(b)   During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

249.   Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for Exhaust Systems and Vehicles containing Exhaust Systems than they otherwise would

REDACTED

have paid in the absence of the Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

250.   In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

251.   Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**THIRD CLAIM FOR RELIEF**
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

252.   Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

253.   Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

254.   Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*.

(a)   Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Exhaust Systems were sold,

**REDACTED**

distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)     Defendants' unlawful conduct had the following effects: (1) Exhaust System price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Exhaust System prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**REDACTED**

255.   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*.

(a)     During the Class Period, Defendants marketed, sold, or distributed Exhaust Systems in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

(c)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)     Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Antitrust Act, as set

**REDACTED**

forth above; (2) the violations of Section 16720, *et seq*., of the California Business and Professions Code, set forth above;

(e)     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq*., of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(f)     Defendants' acts or practices are unfair to purchasers of Exhaust Systems (or Vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code;

(g)     Defendants' unlawful conduct had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout California; (2) Exhaust Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Exhaust Systems or Vehicles in California, were deprived of free and open competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Exhaust Systems or Vehicles in California, paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems, including in California.

**REDACTED**

(h)     Defendants' acts and practices are unlawful, fraudulent, or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(i)     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(j)     The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Exhaust Systems (or Vehicles containing them). Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

256.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a)     Defendants' unlawful conduct had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout

**REDACTED**

Florida; (2) Exhaust System prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems, and (5) Reasonable purchasers in Florida were deceived into believing that they were paying competitive prices for their Vehicles and Exhaust Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      Defendants have engaged in unfair competition or unlawful, unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

257.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Exhaust Systems were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

**REDACTED**

(b)     Plaintiffs were not aware of the Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by the Defendants for Exhaust Systems.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price. Moreover, Plaintiffs lacked any meaningful choice in purchasing Exhaust Systems because they were unaware of the unlawful overcharge and because they had to purchase Exhaust Systems in order to be able to operate their Vehicles. Defendants' conduct with regard to sales of Exhaust Systems, including their illegal conspiracy to secretly fix the price of Exhaust Systems at supracompetitive levels and overcharge automobile dealers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs.

(c)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Exhaust Systems as set forth in N.M.S.A. § 57-12-2E, due to the inflated prices paid by Plaintiffs and Class members for Vehicles and Exhaust Systems.

(d)     Defendants' unlawful conduct had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Exhaust System prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the

REDACTED

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems.

(e)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(f)     As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

258.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Exhaust Systems were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the Exhaust Systems they had purchased inside Vehicles had been sold at legal competitive prices, when they had in fact been sold at

**REDACTED**

collusively obtained inflated prices, that were ultimately borne by automobile dealers.

(c)     The conduct of the Defendants described herein constitutes consumer oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     Because of the Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Exhaust Systems were misled to believe that they were paying a fair price for Exhaust Systems or the price increases for Exhaust Systems were for valid business reasons; and similarly situated automobile dealers were potentially affected by Defendants' conspiracy.

(e)     Defendants' unlawful conduct had the following effects:   (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout New York; (2) Exhaust Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of Vehicles or Exhaust Systems in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York; and (4) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of Vehicles and Exhaust Systems in New York, paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems, and were subjected to Defendants' deceptive practices.

**REDACTED**

(f)     Defendants knew that their unlawful trade practices with respect to pricing Exhaust Systems would have an impact on all purchasers in New York and not just the Defendants' direct customers.

(g)     Defendants knew that their unlawful trade practices with respect to pricing Exhaust Systems would have a broad impact, causing class members who indirectly purchased Exhaust Systems to be injured by paying more for Exhaust Systems than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(h)     During the Class Period, Defendants marketed, sold, or distributed Exhaust Systems in New York, and Defendants' illegal conduct substantially affected New York commerce and New York purchasers.

(i)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Exhaust Systems in New York.

(j)     Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

259.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Exhaust Systems were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

**REDACTED**

(b)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)     Defendants' unlawful conduct had the following effects: (1) Exhaust System price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Exhaust System prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Exhaust Systems or Vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Exhaust Systems or Vehicles in North Carolina, paid supracompetitive, artificially inflated prices for Exhaust Systems and Vehicles containing Exhaust Systems, including in North Carolina.

(d)     During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce and purchasers of Exhaust Systems and Vehicles.

(e)     Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy.   Defendants committed inherently deceptive and self-

**REDACTED**

concealing actions, of which Plaintiffs could not possibly have been aware. Moreover, Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

(f)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, marketed, sold and/or distributed Exhaust Systems in North Carolina.

(g)     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

260.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq*.[7]

(a)     Defendants' combinations or conspiracies had the following effects: (1) Exhaust Systems price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Exhaust Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open

---

[7] Included for appellate purposes.

2:16-cv-03702-MOB-MKM   Doc # 79   Filed 06/29/17   Pg 100 of 106   Pg ID 3373

**REDACTED**

competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Exhaust Systems.

(b)      During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(on behalf of Plaintiffs and the Damages Class)**

261.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

262.    Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra*, with the exception of California, but including South Carolina.  Plaintiffs also bring this claim under the laws of Missouri, Massachusetts, and Illinois on behalf of the Plaintiffs who have their primary places of business in those three states and the class members in those three states.

263.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Exhaust Systems.

**REDACTED**

264.     Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Exhaust Systems.

265.     Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

266.     Pursuit of any remedies against the firms from which Plaintiffs and the members of the Damages Class purchased Vehicles containing Exhaust Systems subject to Defendants' conspiracy would have been futile, given that those firms did not take part in the Defendants' conspiracy.

## **PRAYER FOR RELIEF**

Accordingly, Plaintiffs respectfully request that:

267.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

268.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

**REDACTED**

        (b)     A *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

        (c)     An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

        (d)     Acts of unjust enrichment by Defendants as set forth herein.

269.    Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

270.    Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

271.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

272.    Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

REDACTED

273.    Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

274.    Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

275.    Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

Date: June 29, 2017

MANTESE HONIGMAN, P.C.
 */s/ Gerard V. Mantese*
Gerard V. Mantese
(Michigan Bar No. P34424)
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 457-9200
gmantese@manteselaw.com

***Interim Liaison Counsel for Dealership Plaintiffs***

Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Yifei Li
**CUNEO GILBERT & LaDUCA, LLP**
Suite 200
4725 Wisconsin Avenue, NW
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com

Don Barrett
David McMullan
**BARRETT LAW GROUP, P.A.**

**REDACTED**

P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone:  (662) 834-2488
Facsimile:   (662)834-2628
dbarrett@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Shawn M. Raiter
**LARSON · KING, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone:  (651) 312-6500
Facsimile:   (651) 312-6618
sraiter@larsonking.com

***Interim Co-Lead Class Counsel for
Dealership Plaintiffs***

**REDACTED**

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

Date: June 29, 2017                              MANTESE HONIGMAN, P.C.
                                                 */s/ Gerard V. Mantese*
                                                 Gerard V. Mantese
                                                 (Michigan Bar No. P34424)
                                                 1361 E. Big Beaver Road
                                                 Troy, Michigan 48083
                                                 Telephone: (248) 457-9200
                                                 gmantese@manteselaw.com

                                                 ***Interim Liaison Counsel for Dealership
                                                 Plaintiffs***

                                                 Jonathan W. Cuneo
                                                 Joel Davidow
                                                 Daniel Cohen
                                                 Victoria Romanenko
                                                 Yifei Li
                                                 **CUNEO GILBERT & LaDUCA, LLP**
                                                 Suite 200
                                                 4725 Wisconsin Avenue, NW
                                                 Washington, DC 20016
                                                 Telephone: (202) 789-3960
                                                 jonc@cuneolaw.com
                                                 joel@cuneolaw.com
                                                 danielc@cuneolaw.com
                                                 vicky@cuneolaw.com
                                                 evelyn@cuneolaw.com

                                                 Don Barrett
                                                 David McMullan
                                                 **BARRETT LAW GROUP, P.A.**
                                                 P.O. Box 927
                                                 404 Court Square
                                                 Lexington, MS 39095
                                                 Telephone: (662) 834-2488
                                                 Facsimile: (662)834-2628
                                                 dbarrett@barrettlawgroup.com
                                                 dmcmullan@barrettlawgroup.com

**REDACTED**

Shawn M. Raiter
**LARSON · KING, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone:  (651) 312-6500
Facsimile:  (651) 312-6618
sraiter@larsonking.com

*Interim Co-Lead Class Counsel for
Dealership Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

 I hereby certify that on July 29, 2017, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send electronic notices of same to all counsel of record.

<u>/s/Sherri Sikorski</u>
Sherri Sikorski
Mantese Honigman, P.C.
1361 E. Big Beaver Rd.
Troy, Michigan 48083
Telephone: (248) 457-9200
ssikorski@manteselaw.com